UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANTHEM SPORTS & ENTERTAINMENT CORP. and FANTASY SPORTS NETWORK INC., <br><br> Plaintiffs, <br><br> -against- <br><br> DRAFTKINGS INC., <br><br> Defendant. | Case No. 16-cv-7464 <br><br> **Jury Trial Demanded** <br><br> **Complaint** |

Plaintiffs Anthem Sports & Entertainment Corp. ("Anthem") and Fantasy Sports Network Inc. ("Fantasy") (hereinafter sometimes referred to as "Plaintiffs"), by their undersigned counsel, as and for their complaint against defendant DraftKings Inc. ("DraftKings") allege as follows[1]:

## Nature of the Case

1. Plaintiffs bring this action seeking money damages against DraftKings based on an account stated, for breach of contract in connection with DraftKings' failure to fulfill its obligations pursuant to the parties' agreement and unjust enrichment based on DraftKings' failure to compensate Plaintiffs for the services Plaintiffs provided and the benefits DraftKings received, for promissory estoppel and for the costs DraftKings caused Plaintiffs to incur in connection with this action.

## Parties

2. Anthem is an Ontario corporation with its principal offices at 171 East Liberty Street, Suite 230, Toronto, Ontario M6K 3E7, Canada.

---

[1] All allegations are on information and belief unless otherwise stated.

3. Fantasy is a Delaware corporation controlled by Anthem having an office at 132 West 31st Street, New York, New York 10001.

4. DraftKings is a Massachusetts corporation with its principal place of business at 125 Sumner Street, Suite 510, Boston, Massachusetts 02110 and offices at 400 Lafayette Street, New York, New York 10003. DraftKings maintained offices at 36 E 12th Street, New York, New York 10003 at times discussed in this Complaint.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

6. This Court has personal jurisdiction over DraftKings pursuant to C.P.L.R. § 302 given that it transacts and solicits business within this District.

7. Venue in this District is proper under 28 U.S.C. § 1391 (b)(2) because DraftKings conducts substantial business in this District, substantial events giving rise to this action occurred in this District, and DraftKings has caused Plaintiffs harm within this District and § 1391 (c)(2) because DraftKings maintains an office in this District.

## FACTS COMMON TO ALL COUNTS

8. Anthem owns and operates television channels on linear, digital and mobile platforms, including but not limited through its Fantasy subsidiary.

9. Fantasy produces live studio programming, call-in shows, panels and on-site commentary from sports venues, all specifically targeted toward people who play fantasy sports annually and on a daily basis. Fantasy broadcasts and publishes content though a linear cable network, over-the-top platforms, a mobile application, satellite radio and online.

10. Louis M. Maione ("Maione") is the Chief Strategy Officer for Anthem and Co-Founder of RotoExperts, LLC, a limited liability corporation owned by Fantasy.

11.     DraftKings is an online service provider that enables users to participate in online daily fantasy sports contests.

12.     Jason Robins ("Robins") is Chief Executive Officer and Co-Founder of DraftKings.

13.     In February 2015, Maione proposed to Robins a non-exclusive commercial agreement whereby DraftKings would purchase advertising and sponsor television programs to appear on Plaintiffs' various media platforms, including Plaintiffs' linear broadcast channel (the "Commercial Deal"). Robins referred Maione to the Vice-President of Marketing for DraftKings, Anthony Pitts ("Pitts") to negotiate the terms of the Commercial Deal. Pitts was Vice-President of Marketing for DraftKings at all times while the parties negotiated the Commercial Deal and Pitts had authority to negotiate and execute the Commercial Deal.

14.     Robins stated that DraftKings would require Fantasy to operate a television studio in New York City as a condition for the Commercial Deal. Robins stated that DraftKings' association with a program broadcast from New York City would appear more high-profile and sponsorship of a program based in New York City would contribute more to DraftKings' image than a program based elsewhere.

15.     Advertising on Fantasy, which reaches close to seventy-five million homes globally through its digital channels and nearly one million homes in the United States through its linear cable network, is extremely valuable to DraftKings, especially because Fantasy appeals to viewers who are likely to use DraftKings' fantasy sports service.

16.     Anthem is based in Toronto, Ontario and did not have facilities to produce content in New York City prior to the Commercial Deal.  Plaintiffs needed to make substantial

investments in order to secure, equip, staff and operate a new production studio in New York to satisfy DraftKings' needs.

17. Maione explained to Robins—and DraftKings understood—that the Commercial Deal would cover many of Anthem's necessary costs in establishing a television studio in New York City (the "NYC Studio"). DraftKings further understood that Plaintiffs would establish the NYC Studio and make other significant investments in reliance on DraftKings' commitments. Also in connection with the Commercial Deal, Maione and Robins discussed a strategic investment by DraftKings in Fantasy. These informal discussion resulted in Robins' proposal that DraftKings acquire Fantasy from Anthem (the "Proposed Acquisition").

18. Under the Commercial Deal, DraftKings would sponsor—and Plaintiffs would produce—at least two half-hour daily programs throughout each week featuring DraftKings branding and advertisements (the "DK Programming"). Fantasy would broadcast the DK Programming on Fantasy's linear cable network, Fantasy would make the DK Programming available through Fantasy's video-on-demand and digital channels, including YouTube, and Fantasy would provide the DK Programming to Fantasy's third-party syndication partners.

19. Under the Commercial Deal, Fantasy would also secure advertising space for DraftKings on www.dailyroto.com ("DailyRoto"), a website providing information and news for participants in daily fantasy sports contests, such as those offered by DraftKings.

20. Under the Commercial Deal, the DK Programming created by Plaintiffs would be new, original content featuring newly acquired talent in the NYC Studio.

4

**DraftKings and Plaintiffs Entered Into the June Commercial Agreement**

21. While Robins continued discussions of the Proposed Acquisition, Maione continued negotiating the Commercial Deal with Pitts.

22. Maione explained to Pitts and Robins that Plaintiffs would require "ramp time," or time in which to prepare content, facilities, talent and other necessary infrastructure for the DK Programming.

23. Maione explained to Robins that the budget required to make the capital investment in and operate the NYC Studio would be approximately $2,800,000.00.

24. Plaintiffs required DraftKings—and DraftKings agreed—to commit to at least one year under the Commercial Deal (which had a duration of three years), so that Plaintiffs could recover at least some of their investment in the NYC Studio and other expenses that they would incur in performing the Commercial Deal. Plaintiffs explicitly explained this requirement and the reason for it to DraftKings, which agreed to it.

25. Plaintiffs and DraftKings mutually drafted a document reflecting the material terms of the Commercial Deal (the "June Commercial Agreement"), which Maione executed for Plaintiffs and Pitts executed for DraftKings, in June 2015.

26. Under the June Commercial Agreement, DraftKings was to pay $1,500,000 each year in monthly installments for three years. The June Commercial Agreement provided that either party had the right to terminate the agreement in the seven days immediately following each of the first and second years after the agreement's execution.

27. DraftKings took responsibility for drafting a more comprehensive document for the Commercial Deal based on the June Commercial Agreement (the "More Comprehensive Document").

28. The June Commercial Agreement, when it was originally executed, contained all of the essential and material terms of the Commercial Deal.

29. The More Comprehensive Document was intended to supersede the June Commercial Agreement and would contain more detailed terms regarding the specific content to be aired.

**DraftKings' Delayed Execution of a More Comprehensive Document**

30. Pitts informed Maione, referring to the More Comprehensive Document, that he had "[k]icked the process off to start the contract" by email dated June 3, 2015.

31. DraftKings failed to produce the More Comprehensive Document, despite regular reminders from Maione. Robins suggested on multiple occasions to Maione, to Anthem's CEO and to Anthem's in-house counsel, that instead of finalizing the More Comprehensive Document and also drafting a separate agreement to complete the Proposed Acquisition, that the terms of the More Comprehensive Document be incorporated into the agreement for the Proposed Acquisition. By waiting to finalize the More Comprehensive Document until the Proposed Acquisition was finalized, Robins significantly delayed the execution of the More Comprehensive Document.

32. Robins' recommendations that DraftKings draft a single omnibus agreement which incorporated both the Commercial Deal and the Proposed Acquisition was intended to and did induce Plaintiffs to continue performing pursuant to the terms of the June Commercial Agreement.

33. Maione repeatedly insisted to Pitts and Robins that DraftKings complete and enter into the More Comprehensive Document or otherwise commit to the Commercial Deal. In response, Pitts repeatedly represented that DraftKings was committed to the

Commercial Deal and consistently represented to Maione that DraftKings was working on drafting the More Comprehensive Document.

**DraftKings Sought To Induce Plaintiffs' Performance Under the June Commercial Agreement In Time For Football Season**

34.     In or around August 2015, Pitts began requesting that Fantasy prepare to launch the DK Programming before the start of football season, which was scheduled to begin on or about September 10, 2015, and during which DraftKings intended to advertise heavily (the "Football Advertising Blitz").

35.     Pitts informed Maione that it was important for DraftKings that Plaintiffs' performance under the Commercial Deal begin in time for DraftKings' intended Football Advertising Blitz.

**Plaintiffs and DraftKings Entered Into the August Commercial Agreement**

36.     Maione made an offer to Pitts and Robins that Plaintiffs would proceed with the Commercial Deal under the terms in the June Commercial Agreement until DraftKings could produce the More Comprehensive Document, provided that the parties enter into a new version of the June Commercial Agreement without the non-binding provisions that it included (the "August Commercial Agreement").

37.     Maione communicated the offer that Plaintiffs and DraftKings modify the June Commercial Agreement so that it would govern the parties relationship "without the non binding clause" by a Short Message Service ("SMS") on August 25, 2015, which Pitts accepted that day, stating:

> ok
>
> let's get working in good faith
>
> agreed

38. The August Commercial Agreement explicitly incorporates the terms of the June Commercial Agreement, but removes the terms limiting its binding effect, making the terms of the June Commercial Agreement fully enforceable between the parties.

39. The August Commercial Agreement is supported by consideration because it contains binding promises by both parties and because of the expensive commitments made by Plaintiffs to satisfy their contractual obligations.

40. The parties to the August Commercial Agreement clearly expressed their intention to be bound by its terms.

41. Plaintiffs reasonably believed that Pitts had the authority to enter into the August Commercial Agreement.

42. All of the essential terms of the August Commercial Agreement were included in the June Commercial Agreement it referenced and were agreed upon.

43. The August 25, 2015 exchange of SMS messages between Maione and Pitts, who had executed the June Commercial Agreement, constitute a writing that memorializes the parties' agreement to be bound by the August Commercial Agreement.

**Plaintiffs Performed the Commercial Agreements**

44. Plaintiffs abandoned negotiations with DraftKings' competitors for advertising services that were, at a minimum, equivalent to the Commercial Deal, so that Plaintiffs could successfully fulfill their obligations to DraftKings.

45. Ferdinando Di Fino, Executive Producer for Plaintiffs, ("Di Fino") initially contacted Mark Neremberg, Vice President of Game Operations and Development for DraftKings, ("Neremberg"), on or about July 9, 2015, to discuss content to include in the DK Programming.  Neremberg invited Di Fino to DraftKings' New York office, where they continued their conversation in person.

46.     DraftKings selected talent that would appear on the DK Programming and provided materials necessary to display DraftKings' brand on the DK Programming.

47.     After the parties entered into the August Commercial Agreement, Di Fino confirmed the format and the content of the two shows composing the DK Programming by email to Neremberg on or about August 31, 2016.  Neremberg replied that he would continue to provide input to Di Fino regarding content to feature on the DK Programming.

48.     On or about September 1, 2015, Fantasy began airing the DK Programming pursuant to the parties' agreement.

49.     Pitts acknowledged that Plaintiffs had commenced performance of the Commercial Deal in an email dated September 15, 2015 and asked when Plaintiffs had begun broadcasting the DK Programming.  Maione informed Pitts by SMS, also dated September 15, 2015, that the DK programming had launched as of September 1, 2015, as Pitts had requested, before the parties executed the More Comprehensive Document.  Maione then sent to Pitts an SMS message showing an image of the DK Programming set featuring DraftKings' branding.  Pitts responded with enthusiastic approval, stating, "set looks hot."

50.     DraftKings' agents and employees regularly expressed their approval of the DK Programing.

51.     Plaintiffs' writers and producers and DraftKings' content and operations teams had regular communications regarding the content and games that would be featured on DraftKings and how it could be incorporated into the DK Programming.

52. Recognizing them to be in effect, the parties performed under the terms of the June Commercial Agreement until DraftKings unlawfully stopped payments.

**Plaintiffs and DraftKings Entered Into the September Commercial Agreement**

53. Pitts suggested that the monthly payments under the Commercial Deal for the first year be made in equal monthly installments of $125,000 by email dated September 15, 2015.

54. Later, Maione and Pitts agreed that a component of Anthem's and Fantasy's performance under the Commercial Deal, the advertising on DailyRoto, would not launch immediately and that DraftKings' monthly payments be $115,000 for those months in which DailyRoto did not advertise DraftKings' services.

55. The August Commercial Agreement, as modified by specifying equal monthly payments and a reduced fee if DraftKings is not advertised on DailyRoto, is the "September Commercial Agreement." The June Commercial Agreement, the August Commercial Agreement and the September Commercial Agreement taken together are the "Agreement."

**DraftKings Failed to Make Timely Payments for Plaintiffs' Services**

56. DraftKings spent more than $80,000,000 on advertisements that aired during the month of August 2015. The Wall Street Journal published a blog on September 16, 2015, in which it quoted Robins as saying "this is not something that is year-round for us. It's a brief window where you can fish when the fish are biting."[2]

---

[2] Steven Perlber, Are DraftKings and FanDuel Bombarding Fans With Too Many Ads?, The Wall Street Journal (Sep. 16, 2015, 6:00 AM), http://blogs.wsj.com/cmo/2015/09/16/are-draftkings-and-fanduel-bombarding-fans-with-too-many-ads/

10

57.     DraftKings had agreed—and was committed—to pay Plaintiffs under the Commercial Deal each month for at least a year, not only "when the fish are biting."

58.     Robins instructed Maione to have Plaintiffs send Plaintiffs' invoices under the Commercial Deal to Pitts.

59.     DraftKings paid the first three invoices under the Commercial Deal, which induced Plaintiffs to continue making their investments required to perform their contractual commitments, with the full expectation of being paid. For no stated reason, DraftKings stopped paying Plaintiffs' invoices thereafter.

60.     Plaintiffs issued an invoice to DraftKings, numbered DK1092015 for $100,000, for services rendered between August 17, 2015 and September 16, 2015, dated October 1, 2015 ("Invoice 1"), by email to Pitts.

61.     Maione and Pitts agreed that Invoice 1 would be reduced to $100,000 to reflect that Plaintiffs' performance had not begun until September 1, 2015.

62.     Pitts acknowledged receipt of Invoice 1 by email dated October 14, 2015 and said he would see to payment.

63.     Plaintiffs issued an invoice to DraftKings, numbered DK2102015 for $115,000, for services rendered between September 17, 2015 and October 16, 2015, dated October 17, 2015 ("Invoice 2"), by email to Pitts.

64.     DraftKings later paid invoice 2.

65.     Plaintiffs issued an invoice to DraftKings, numbered DK3112015 for $115,000, for services rendered between October 17, 2015 and November 16, 2015, dated November 11, 2015 ("Invoice 3"), by email to Pitts.

66. Plaintiffs issued an invoice to DraftKings, numbered DK4122015 for $115,000, for services rendered between November 17, 2015 and December 16, 2015, dated December 29, 2015 ("Invoice 4"), by email to Pitts. A copy of Invoice 4 is attached hereto as Exhibit A.

67. Plaintiffs issued an invoice to DraftKings, numbered DK5012016 for $115,000, for services rendered between December 17, 2015 and January 16, 2016, dated January 20, 2016 ("Invoice 5"), by email to Pitts. A copy of Exhibit 5 is attached hereto as Exhibit B.

68. Plaintiffs repeatedly invited DraftKings to ask any questions it may have about the substance of Plaintiffs' invoices and DraftKings never raised any questions.

69. Maione, noting that there were three outstanding invoices to DraftKings, called and left a voicemail for Pitts on or about February 1, 2016, inquiring about payment. Maione followed-up with an SMS message to Pitts on or about February 2, 2016.

70. Pitts replied to Maione by SMS on or about February 2, 2016, stating that he had approval from DraftKings' comptroller to pay Invoice 3. Pitts concluded with the statement "stay tuned." DraftKings later paid Invoice 3.

71. Plaintiffs issued an invoice to DraftKings, numbered DK6022016 for $115,000, for services rendered between January 17, 2015 and February 16, 2016, dated February 24, 2016 ("Invoice 6"), by email to Pitts. A copy of Invoice 6 is attached hereto as Exhibit C. In that communication, Plaintiffs also inquired about payment of the outstanding Invoice 4 and Invoice 5.

72. Plaintiffs' writers and producers and DraftKings' content and operations teams continued to communicate regarding how Plaintiffs should present DraftKings' services and what DraftKings events to feature in the DK Programming.

73. Plaintiffs contacted DraftKings again on March 8, 11 and 16, 2016 regarding payment of Invoice 4, Invoice 5 and Invoice 6.

74. Plaintiffs issued an invoice to DraftKings, numbered DK7032016 for $115,000, for services rendered between February 17, 2015 and March 16, 2016 on or about March 17, 2016 ("Invoice 7") by email. A copy of Invoice 7 is attached hereto as Exhibit D.

75. Maione contacted Robins by SMS on April 4, 2016, stating that payments under the Commercial Deal were past due and that negotiations had stalled for the Proposed Acquisition. Maione also asked DraftKings to make payments under the Commercial Deal. Robins responded, stating he would talk to Corey Gottlieb, a DraftKings employee, and that he would ensure that the payments were made.

76. At no point did Robins deny that Plaintiffs were owed payment for the work they had performed under the Commercial Deal.

77. In subsequent conversations between Robins and Maione, Robins suggested that the amounts that DraftKings owed to Plaintiffs under the Commercial Deal could be included in the Proposed Acquisition as an amount payable. Maione responded by rejecting this proposal and stating that he would not be able to proceed with the Proposed Acquisition if DraftKings could not fulfill its existing commitments.

78. Janet Holian, Chief Financial Officer for DraftKings, ("Holian") requested further information from Maione regarding the Commercial Deal by emails dated April 4, 2016.

79. Holian suggested to Maione that Plaintiffs stop producing the DK Programming and stated that DraftKings was not obligated to pay Plaintiffs by email dated April 11, 2016. With full knowledge of the expenses that Plaintiffs had incurred in producing the DK Programming, Holian repudiated the Commercial Deal.

80. Plaintiffs issued an invoice to DraftKings, numbered DK8042016 for $115,000, for services rendered between March 17, 2015 and April 16, 2016 on or about May 11, 2016 ("Invoice 8") by email to Robins. A copy of Invoice 8 is attached hereto as Exhibit E.

81. DraftKings has not paid Invoice 4, Invoice 5, Invoice 6, Invoice 7 or Invoice 8 (the "Unpaid Invoices"), which sum to a total of $575,000.

## CLAIM ONE

### Account Stated

82. Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 81, as if fully set forth herein

83. Fantasy presented DraftKings with the Unpaid Invoices.

84. DraftKings received the Unpaid Invoices.

85. DraftKings has not objected to any of the Unpaid Invoices.

86. The reasonable time within which DraftKings could object to the Unpaid Invoices has elapsed.

87. DraftKings' failure to dispute or object to the Unpaid Invoices within a reasonable time frame established an account stated for the amounts shown as due on the Unpaid Invoices.

88. As a result of DraftKings' failure to pay its account, Plaintiffs have been injured in the amount of the Unpaid Invoices.

## CLAIM TWO

### Breach of Contract

89. Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 88, as if fully set forth herein.

90. Plaintiffs and DraftKings entered into the Agreement, whereby Plaintiffs would produce the DK Programming and DraftKings would compensate the Plaintiffs.

91. Plaintiffs incurred significant expense fulfilling their contractual commitments and were ready and willing to perform their future obligations under the parties' Agreement.

92. DraftKings then definitively and finally communicated its intention to not fulfill its commitments under the parties' Agreement.

93. As a result of DraftKings' repudiation, Plaintiffs were damaged in the amount of the total remaining value of the Agreement.

## CLAIM THREE

### Promissory Estoppel

94. Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 93, as if fully set forth herein.

95. DraftKings clearly and unambiguously promised Plaintiffs that it would execute a contract reflecting the Commercial Deal.

96. Plaintiffs incurred well over a million dollars in expenses based on DraftKings' promises.

97. Plaintiffs' reliance on DraftKings' promise was foreseeable.

98. As a result of Plaintiffs' reliance on DraftKings' promise, Plaintiffs were injured.

## CLAIM FOUR

### Unjust Enrichment

99. Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 98, as if fully set forth herein.

100. DraftKings was enriched by Plaintiffs' performance of the Commercial Deal, which gave DraftKings exposure to DraftKings' most desired consumers by way of advertisements, product placement and branded programming, all of which were presented in connection with high-quality content that enhanced the image and visibility of the DraftKings brand among DraftKings' user base, while simultaneously depriving DraftKings' competitors of equivalent services from Plaintiffs.

101. DraftKings was enriched at Plaintiffs' expense.

102. Equity and good conscience militate against permitting DraftKings to retain the benefits DraftKings received without payment to Plaintiffs.

103. As a result, DraftKings was unjustly enriched and Plaintiffs were damaged thereby.

## DAMAGES

104. Plaintiffs claim as damages for DraftKings' account stated, breach of contract, promissory estoppel and unjust enrichment an amount to be determined at trial, but no less than $4,160,000.00 in addition to pre- and post-judgment statutory interest in addition to its costs and expenses in connection with this litigation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court issue judgment in their favor against DraftKings for the following relief:

      a.      An award of damages for Plaintiffs' claims of accounts stated, breach of contract, promissory estoppel and unjust enrichment in an amount to be determined at trial but no less than $4,160,000.00, including the amount of the unpaid invoices of $575,000.00, the costs of the Agreement and the benefits that DK received;

      b.      Pre- and post-judgment interest;

      c.      Attorneys' fees and costs; and

      d.      Such additional relief as the court deems just and proper.

Dated: New York, New York
       September 23, 2016

                        THE SERBAGI LAW FIRM, P.C.

                        By: /s/ Laurence Silverman
                           Laurence Silverman, Esq.
                           Christopher Serbagi, Esq.
                           David Rome, Esq.
                           488 Madison Avenue, Suite 1120
                           New York, NY 10022
                           Tele: (212) 593-2112
                           Fax: (212) 308-8582

                         *Attorneys for the Plaintiffs*